**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **DEPLOYED RESOURCES, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:20-cv-00607-HFS** |
| | ) | |
| **DATA SYSTEMS INTERNATIONAL, INC.;** | ) | |
| **BRENT DIBARTOLO;** | ) | **JURY TRIAL DEMANDED** |
| **BENJAMIN CULLINANE; AND** | ) | |
| **MARK BALDWIN;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Deployed Resources, LLC, by and through its undersigned counsel, for its claims for relief against Defendants Data Systems International, Inc., Brent DiBartolo, Benjamin Cullinane, and Mark Baldwin in this First Amended Complaint, states as follows:

## INTRODUCTION

When disasters, special events, or other emergencies require temporary facilities and logistics support, Deployed Resources, LLC ("Deployed") is one of the "first responders." Deployed provides temporary housing infrastructure, critical facilities, and other required supplies when an emergent situation or event requires a rapid, efficient, and reliable response. In carrying out these all-important duties, Deployed is tasked with monitoring, moving, and maintaining a large fleet of portable and temporary assets. For several years, Deployed has relied on a software system with the acronym DRAT to support its asset tracking management, but during the summer of 2018, it was becoming apparent that DRAT needed an update with additional mobile capabilities and interoperability with Oracle's NetSuite cloud-based technology.

Although unsure as to whether it required a "custom" or "off-the-shelf standard" product

1

for its asset tracking application, Deployed knew exactly what functionality it wanted and needed. In August 2018, Deployed began to work with Data Systems International, Inc ("DSI"), who held themselves out as "experts" in software integration and development, specifically in the area of asset tracking management. Initially, DSI told Deployed that its "standard" product (which was under development at the time) would fit Deployed's functionality needs. Deployed signed up with DSI and paid significant sums of money in services fees and license fees, as DSI purportedly worked to configure and integrate its "standard" product with NetSuite for Deployed.

However, after taking significant sums of money from Deployed, DSI determined that its "standard" product would not meet Deployed's functionality needs and that additional funds and time would be required to create a "custom" product for Deployed. Without refunding any money to Deployed for time and money wasted pursuing the "standard" product, DSI convinced Deployed that it should sign up instead for the "custom" product and DSI began charging additional services fees and continued to charge license fees. This change in direction from the "standard" to the "custom" product occurred despite Deployed having never changed the functionality needs and wants that it first expressed to DSI in August 2018.

To this day, after numerous delays and the payment of hundreds of thousands of additional dollars, DSI has been unable to deliver the "custom" product either. And, in fact, DSI employees have admitted in multiple instances that they are not really pursuing a "custom" product for Deployed as previously promised. As a result, Deployed has suffered the delays and paid the costs of both a "standard" and a "custom" product and has neither from DSI at this time.

DSI and its employees knew or should have known that its "standard" product and the corresponding configuration/implementation services of DSI were incapable and would not fulfill DSI's functionality needs and wants. Instead, DSI presented its inadequate "standard" product

and the corresponding configuration/implementation services of DSI as a solution. And then, having failed at providing an adequate "standard" product configured and implemented with Deployed's systems, DSI knew or should have known that it did not have the capability or willingness to produce the "custom" software required. Instead, DSI simply absconded with Deployed's good-faith payments in return for absolutely nothing – except unwanted and continuing delay. These delays have forced Deployed to continue utilization of its existing DRAT system, resulting in functionality and productivity deficiencies which DSI falsely represented it would be able to remedy with its products and services.

## PARTIES

1.      Plaintiff Deployed Resources, LLC ("Deployed") is a New York limited liability company in good standing, with its principal place of business located at 164 McPike Road, Rome, New York 13440.

2.      Defendant Data Systems International, Inc. ("DSI") is a Missouri corporation, with a registered address of 120 South Central Avenue, Clayton, Missouri 63105 and with its principal place of business located at 1201 Walnut, Suite 1100, Kansas City, Missouri 64016.

3.      Upon information and belief, Defendant Brent DiBartolo ("DiBartolo") is a resident and citizen of Ottawa, Quebec, Canada. At all times relevant, Mr. DiBartolo was a Regional Sales Director acting by and through the course and scope of his employment by DSI.

4.      Upon information and belief, Defendant Benjamin Cullinane ("Cullinane") is a resident and citizen of Kansas City, Missouri. At all times relevant, Mr. Cullinane was a Project Manager acting by and through the course and scope of his employment by DSI.

5.      Upon information and belief, Defendant Mark Baldwin ("Baldwin") is a resident and citizen of the Kansas City, Missouri. At all times relevant, Mr. Baldwin was the Chief

Financial Officer ("CFO") acting by and through the course and scope of his employment by DSI.[1]

## JURISDICTION AND VENUE

6. This Court has jurisdiction over DSI because it principally resides in the State of Missouri, and the facts giving rise to this cause of action took place in the State of Missouri and in the Western District of Missouri.

7. This Court has jurisdiction over Messrs. DiBartolo, Cullinane, and Baldwin because said Defendants either reside in the State of Missouri or the facts giving rise to this cause of action and the individual actions of these Defendants took place in the State of Missouri and in the Western District of Missouri.

8. The jurisdiction of this Court and venue in this Western District of Missouri are also proper under 28 U.S.C. § 1332(a)(1) because Deployed and all of Deployed's members (*See* Doc. 5, Plaintiff's Supplemental Statement of Jurisdiction), on the one hand, and all Defendants, on the other hand, are citizens of different states and the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs. Furthermore, to the extent that Mr. DiBartolo is a resident and citizen of Canada, this Court has jurisdiction under 28 U.S.C. § 1332(a)(3), because this matter is between citizens of different states (Deployed and its members, on the one hand, and DSI, Mr. Cullinane and Mr. Baldwin, on the other hand) with a citizen of a foreign state (Mr. DiBartolo) as an additional party, and the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

9. Venue is proper in this Western District of Missouri pursuant to at least 28 U.S.C. § 1391(b)-(d)

---

[1] Deployed reserves its right to name additional defendants, as Deployed obtains and learns more information in discovery regarding other individuals at DSI who actively participated in the fraudulent actions detailed herein.

4

## GENERAL ALLEGATIONS

### *Background on Deployed and its Unique Business Model and Asset Inventory*

10. Deployed is a Veteran-Owned business formed in 2000. Deployed maintains its headquarters in Rome, New York and field operations facilities throughout the entire United States.

11. Deployed is an industry leading logistics management organization that provides temporary facilities and logistical services to the United States military, federal and state governments, and commercial parties to address disruptive occurrences, such as natural disasters, and special events.

12. In providing temporary facilities and logistics management, Deployed manages the delivery and setup of the temporary equipment and facilities, ensures the temporary equipment and facilities are operated correctly and perform appropriately during their use, and oversees the breakdown and removal of the temporary equipment and facilities once the emergency or temporary need has dissipated.

13. The temporary equipment and facilities that are provided, constructed, managed, and deconstructed by Deployed include portable tents, housing, restroom facilities, bedding, furniture, telecommunications equipment, transport vehicles, and other tangible, portable, and valuable assets.

14. Deployed provides its temporary facilities and logistics management services throughout the entire United States, and often on short schedules to account for the emergency needs associated with disruptive occurrences and natural disasters.

15. Due to the asset heavy nature, the broad geographical scope, and the short schedules associated with Deployed's business model, Deployed requires intensive monitoring of its assets

5

so that it can efficiently move assets between temporary sites and quickly identify and fix any defective or broken assets before re-deploying such assets to other temporary sites.

*Deployed's First Contact with DSI*

16.     As part of Deployed's efforts to optimize the use, maintenance, and deployment of its many assets, in the summer of 2018, Deployed began investigating the benefits of upgrading its cloud-based storage and its enterprise resource planning ("ERP") application. The ERP is a user-facing application that communicates with data in cloud-based storage, so that employees of Deployed can input and track information regarding finances, customers, employee personnel, and assets. With respect to the assets tracking module of the ERP, Deployed requires an ERP which provides reliable tracking of the movement of its many assets and indications for when defective or broken assets need to be addressed and remedied.

17.     In the summer of 2018, after engaging in several demos with providers of ERP applications and cloud-based technology, Deployed was particularly interested in using the services provided by Oracle's NetSuite technology ("NetSuite"). NetSuite provides business management and cloud-based storage for businesses like Deployed.

18.     In order to engage NetSuite with an assets tracking module tailored to the unique business needs of Deployed, NetSuite referred Deployed to DSI in or about August 2018. Thereafter, representatives from Deployed and DSI began discussions about Deployed's unique business needs and the ability of DSI, its personnel, and its software options to meet those needs.

19.     Prior to beginning these discussions with DSI in or about August 2018, Deployed was using an assets tracking module referred to as DRAT. Though DRAT had previously been serviceable to Deployed's needs, Deployed's expanding operations were outpacing DRAT's effective functionality. In addition, for some time Deployed's employees had been compiling a

6

"wish list" of upgrades, new functionality features, and other improvements to DRAT that would better serve Deployed in tracking its many assets.

20.    In August 2018, before Deployed entered into any agreements with DSI, Andy Roberts (Chief Operating Officer for Deployed) and Mel Booker (Chief Financial Officer for Deployed) held a phone call with Mr. DiBartolo (Regional Sales Director for DSI). During this phone call, Mr. Roberts and Mr. Booker set out the exact list of items which were required to upgrade the functionality deficiencies which Deployed was currently experiencing with DRAT. Mr. Roberts and Mr. Booker also noted to Mr. DiBartolo that it was critically important that the upgraded asset tracking module, provided by DSI, be capable of full integration with its ERP and NetSuite.

*DSI's Marketing of Inventory Management Solutions and Services*

21.    DSI markets itself as being a platform company that creates cloud supply chain solutions for the digital economy. DSI further markets itself as being capable of providing applications and software to meet the asset inventory management needs of any business "regardless of complexity".

22.    In promoting and providing such asset inventory management services, DSI states in marketing materials that its prospective customers can engage in three separate pathways to meet their asset inventory management needs. These three separate pathways entail different and escalating levels of involvement by DSI, as follows: (1) The "Out-of-the-Box" pathway, where DSI installs a standard application built as a native offering for an ERP for the customer, (2) The "Configured" pathway, where DSI downloads and configures applications based on the business requirements of the customer, and (3) The "Custom" pathway, where DSI provides a fully customized solution to meet specific and unique business needs of the customer.

7

*Statement of Work #1 – The "Standard" Solution*

23.     When Deployed first approached DSI in or about August 2018, Deployed was focused on obtaining an asset inventory application that integrated with NetSuite and which met the unique asset heavy, broad geographical scope, and short schedule needs of Deployed's business model.  In other words, Deployed presented to DSI as a prospective customer needing a relatively complex and customized solution for its unique business needs in the area of asset inventory management.

24.     During and before the August, 2018 phone call between the representatives of Deployed and DSI referenced above in Paragraph 20, Deployed provided DSI with detailed information about its unique needs and the exact functionality requirements for its asset inventory module for its ERP integrated with NetSuite. Mr. DiBartolo, on behalf of DSI, represented that DSI was capable of meeting those needs and would provide Deployed with a statement of work that outlined the DSI services and the software capable of meeting Deployed's needs.

25.     In response to the inquiries and information provided by Deployed about its unique business requirements for its asset inventory module, DSI presented the first Statement of Work ("SOW-1") to Deployed.

26.     SOW-1 indicated that DSI would provide Deployed with the configuration, implementation and delivery of DSI's *standard* Cloud Inventory Services application, integrated with the NetSuite System and a *standard* Asset Management Mobile application.  On information and belief, this *standard* solution was akin to DSI's "Configured" pathway to meeting asset inventory management needs, in that this proposed pathway involved DSI providing months of services to configure and implement the *standard* software within Deployed's operating systems.

27.     On a phone call which took place on August 31, 2018 among Messrs. DiBartolo,

8

Booker and Roberts, Mr. DiBartolo represented to Deployed's representatives that the ***standard*** services outlined in SOW-1 would meet the unique business needs and "wish list" communicated by Deployed's representatives. Based on these representations by Mr. DiBartolo that a ***standard*** product and the corresponding services from DSI would suffice to meet Deployed's unique business needs, Deployed entered into SOW-1 with DSI on August 31, 2018.

28. SOW-1 was executed by Mr. Baldwin (CFO) on behalf of DSI. Upon information and belief, each page of SOW-1 was initialed by Mr. Cullinane (Project Manager). Mr. Baldwin's execution and Mr. Cullinane's initialing of SOW-1 were done prior to the commencement of any work under SOW-1 and, upon information and belief, were done in full contemplation of the contents in SOW-1 as they related to the unique business needs and "wish list" expressed by Deployed prior to SOW-1.

29. Among other services to be provided by DSI under SOW-1, DSI was obligated to develop verification processes between the ***standard*** software and non-DSI systems, verify that mobile devices were functional in the cloud inventory software, develop the required integration between Deployed's host system, guide Deployed with the content and format of user acceptance test ("UAT") scripts and execution plan, execute system integration testing with Deployed within the software, support UAT by covering one complete testing cycle, and create and execute a deployment plan.

30. DSI estimated that, in order to deliver the project scope in SOW-1, Deployed would incur a total of $104,775 in hourly services fees based on the anticipated 495 manhours required to deliver the project scope.

31. The ***standard*** product under SOW-1 was given a "go live" date by DSI of January 1, 2019, as communicated with and by Mr. DiBartolo.

*Software License, Services, and Maintenance Agreement*

32.     In addition to SOW-1, on or before August 31, 2018, DSI presented Deployed with

a Software License, Services, and Maintenance Agreement (the "Software License").

33.     The Software License was intended to provide the following license to Deployed:

**License Grant**
Subject to the terms and conditions of, and payment to DSI by Customer of all license fees
under, this Agreement:

**1.**     DSI grants to Customer a non-exclusive, non-transferable, perpetual, limited
license to use the Software and Documentation on the Customer System(s) for Customer's
internal business operations.

34.     The Software License also contained the following definitions for the defined terms

identified in the above License Grant:

**Software**
The Licensed Products, including any software updates provided as part of Maintenance,
and Developed Software.

**Documentation**
The user, technical, and training documentation produced by DSI and related to a Licensed
Product as effective on the date of Delivery of the particular Licensed Product.

**Licensed Product**
The software programs, including any updates provided, licensed by Customer under this
Agreement.  Licensed Products do not include…Developed Software….

**Developed Software**
Any software developed for Customer by DSI under…this Agreement.

35.     The purported "Software" under the Software License was contained in an

Attachment A and included: (i) Cloud Mobile Supply Chain Platform, (ii) Cloud Integration Suite

for NetSuite: Interfaces for Inventory Management, Sales Order Management, Procurement

Management,     Manufacturing     Management,     Warehouse     Management,     Transportation

Management, Asset Management, and Payroll Management, (iii) Cloud Connect Interface to ERP,

(iv) Cloud Field Service Application, (vi) Cloud Inventory Solution, (v) Cloud Inventory User

10

Licenses, and (vi) Platform Metrics and Operational Insights.

36.     Attachment A to the Software License identified a 36-month license term and a total license fee of $233,600.00, amounting to a monthly license fee of $6,488.88.

37.     On or about August 31, 2018, Deployed and DSI entered into the Software License, with the expectation that DSI's scope of work under SOW-1 would be completed by the "go live" date of January 1, 2019, that was communicated with and by Mr. DiBartolo.

38.     Mr. Baldwin executed the Software License on behalf of DSI.  Mr. Baldwin's execution of the Software License was done prior to the commencement of any work under SOW-1 or the providing of any usable software under the Software License and, upon information and belief, was done in full contemplation of the contents in SOW-1 and the Software License as they related to the unique business needs and "wish list" expressed by Deployed prior to SOW-1.

39.     DSI invoiced Deployed on a monthly basis for the license fee for purported software under the Software License and for services purportedly performed by DSI under SOW-1.  Deployed timely paid all invoices provided by DSI for the purported license fees and the purported work performed by DSI under SOW-1.

*DSI's Failure to Deliver a Functional Solution under SOW-1 and the Software License*

40.     On or about November 30, 2018, representatives from Deployed and DSI (including Mr. Cullinane) engaged in an approximately ninety (90) minute phone call, during which Deployed expressed its frustrations with the lack of discernable progress from DSI.  During this phone call, Deployed and DSI once again went over the unique business needs and "wish list" of items from Deployed.  This time, however, DSI noted that the "wish list" of items were outside the scope of their *standard* product and the corresponding services in SOW-1 and would instead require a *custom* build of software.  According to DSI, this *custom* build would require a new

11

Statement of Work and additional payments from Deployed to DSI.

41.     On December 5, 2018, Mr. Cullinane emailed Deployed indicating that he had reviewed the information discussed during the November 30, 2018 phone call, and that he and the development team were trying to "determine the best path forward". However, as noted above, the "wish list" and business needs of Deployed were unchanged since the initial conversations between Deployed and DSI and the execution of SOW-1 (which was initialed by Mr. Cullinane).

42.     Also on December 5, 2018 and contrary to the ongoing reality that Deployed had not changed its "wish list," Mr. DiBartolo emailed Deployed indicating that he was in the Kansas City office meeting with the project team "to discuss a long list of additions to the original scope for this project." Mr. DiBartolo also noted in that same email that: "DSI can handle all of the proposed additions but I suggested that we organize a meeting with you and your team to make sure we fully understand the 'need to haves' vs the 'nice to haves' since each addition will have an impact on cost and timing."

43.     At the time it became apparent that the *standard* product and corresponding services under SOW-1 from DSI were inadequate for Deployed's unique business needs (despite the requests and "wish list" having been unchanged by Deployed since before SOW-1), Deployed had already paid DSI approximately $89,000 for license fees and purported services provided by DSI.

44.     Because the *standard* product and corresponding services under SOW-1 offered by DSI were not adequate, Deployed was unable to use any of the "Software" under the Software License and, thus, had not received any benefit under the Software License. Deployed had paid DSI for purported services in integrating the *standard* product with Deployed's ERP and NetSuite, yet Deployed was without any functional asset inventory module despite having paid all such

service fees.

<em><strong>Statement of Work #2 – The "Custom" Solution</strong></em>

45.     Despite having wasted nearly four (4) months pursuing a ***standard*** solution that was clearly inadequate for Deployed's unique business needs from the get-go and after charging Deployed approximately $89,000 in the process, DSI continued discussing with Deployed the possibility of following the ***custom*** solution pathway and generating a fully customized application in lieu of DSI's ***standard*** product.

46.     On or about December 17, 2018, Mr. DiBartolo and Mr. Baldwin met and devised a plan to keep Deployed on the hook for service fees and license fees to DSI, despite having no functional asset tracking module or any usable software to show for those expenditures. Under this plan, DSI offered to *extend* the Software License by 24 months but to only require payments from Deployed for 18 of those 24 months. This offer by DSI to extend a Software License that was already providing no benefit to Deployed was purportedly made by DSI "to show some good faith" but was also admittedly made by DSI to "let [the DSI] CFO book and recognize revenue within this fiscal year…". This offer by DSI was not accepted by Deployed.

47.     Nevertheless, in or about January 2019, DSI provided Deployed with a second Statement of Work ("SOW-2") which purportedly outlined the services that DSI would provide to Deployed in generating a fully customized application. SOW-2 was aptly titled "***Custom*** Field Inventory Application" (emphasis added).

48.     SOW-2 was also executed by Mr. Baldwin on behalf of DSI. Upon information and belief, each page of SOW-2 was also initialed by Mr. Cullinane. Upon information and belief, Mr. Baldwin executed SOW-2 and Mr. Cullinane initialed SOW-2 in full contemplation of the contents therein, the conversations between representatives of Deployed and DSI about the need

13

for a fully *custom* product, and the unique business needs and "wish list" expressed by Deployed prior to SOW-1 and throughout the business relationship between Deployed and DSI.

49.     SOW-2 indicated that DSI would provide Deployed with custom built screen wireframes and base requirements addressing Deployed's "wish list" and targeting the three functionality focal points for Deployed: (1) Field Inventory, (2) Case Management, and (3) Daily Reporting.

50.     Among other services to be provided by DSI under SOW-2, DSI was obligated to develop verification processes between the *custom* software and non-DSI systems, create the design documents for the software products to be *custom* developed by DSI, build and configure the hardware environment and install the *custom* software in accordance with the functional and technical design documents delivered by DSI, guide Deployed with the content and format of user acceptance test ("UAT") scripts and execution plan, execute system integrated testing with Deployed within the software, support UAT covering one complete testing cycle, and create and execute a deployment plan.

51.     DSI estimated that, in order to deliver the project scope in SOW-2, Deployed would incur an additional $297,000 based on hourly rates and the anticipated 1,800 manhours required to deliver the project scope.  These  fees for services were requested by DSI in addition to the service fees already incurred by Deployed under SOW-1, even though the purported services provided by DSI under SOW-1 were now known to have had no possibility of meeting the unique business needs that were expressly indicated by Deployed since before DSI's presentation of SOW-1 up through and including the presentation of SOW-2.

52.     In trying to decipher the difference between the services proposed by DSI in SOW-1 and SOW-2, the Chief Administrative Officer for Deployed, on February 21, 2019, wrote via

14

email to Mr. DiBartolo the following:

Brent—

We've reviewed the new SOW.  Is it possible to delineate what we originally purchased from what is different now?  I think we are looking for something that outlines the changes and respective costs in a more formal format.

53.     Mr. DiBartolo responded by email, on March 4, 2019, with the following:

"…The biggest difference between the initial SOW and this one…is that this will be a ***fully custom build*** of these apps for Deployed Resources.  As we discussed in our last group meetings, the fastest and most cost-efficient way to deploy these specific applications for Deployed Resources is to have our team ***build them from the ground up***.  The hours and timelines are much more fluid than in a simple base software deployment…." (emphases added).

54.     In reliance on Mr. DiBartolo's representations about the fully-custom build services that would or could be provided by DSI "from the ground up", Deployed and DSI entered into SOW-2 on March 7, 2019.  Mr. DiBartolo had previously expressed to Deployed that DSI "could handle" all the proposed additions to the project.

55.     Since the execution of SOW-2 through the present date, DSI has invoiced Deployed each month for hourly services for "***Custom*** Field Inventory Application". (emphasis added).

56.     SOW-1 and SOW-2 each incorporated the Software License by reference and stated that the Software License "[would] be used for all terms and conditions not specifically included in this SOW."

57.     With regard to services provided by DSI, including those services under SOW-1 and SOW-2, the Software License required DSI to perform those services "in a professional and workmanlike manner".

### *DSI's Failure to Deliver a Functional Solution under SOW-2*

58.     In or about late March 2019, representatives from Deployed and DSI (including Mr. Cullinane) met in Rome, New York to discuss the schedule of dates that DSI would complete

its services and provide deliverables to Deployed under SOW-2.

59.     On or about May 8, 2019, after repeated follow-up contact from Deployed on the status of receiving a schedule of dates to complete the project scope under SOW-2, DSI provided a schedule (the "First Schedule") that identified the three functionality focal points of DSI's *custom* software build and the timeline for completion of each, as follows: (1) "Case Management", with the *custom* software build commencing on June 3, 2019 and concluding on June 21, 2019, (2) "Daily Reporting", with the *custom* software build commencing on July 8, 2019 and concluding on July 26, 2019, and (3) "Field Inventory", with the *custom* software build commencing on July 29, 2019 and concluding on August 16, 2019.

60.     The First Schedule also allotted time for DSI to build and run quality assurance checks on *custom* components in the implementation phase between September 16, 2019 and October 4, 2019.

61.     The First Schedule included a "go live" date of December 1, 2019, and a final handover and project completion date of January 30, 2020.

62.     On June 26, 2019, Mr. Cullinane sent an email to Deployed noting the following: "[b]ecause a large majority of the functional deliverables for [Deployed's] project are being developed as *standard* product by DSI[,] [Deployed] will not be receiving many invoices as this work is being capitalized.  The majority of billable hours will come after the *standard* product release slated for early September [2019]." (emphasis added).

63.     This email, referencing only *standard* product by DSI, was sent by Mr. Cullinane five days after the purported date, in the First Schedule,  by which DSI was to conclude its *custom* software build for the Case Management functionality.  In this same email, Mr. Cullinane provided an updated schedule which adjusted some of the deadlines in the First Schedule, but did not

16

materially alter the timelines for the *custom* builds of the three functionality focal points or the ultimate "go live" or project completion dates.

64.       Sensing that DSI was not making adequate progress under SOW-2 and because DSI failed to provide requested weekly status updates, Deployed arranged for a standing phone call to occur each Thursday between representatives of Deployed and DSI regarding the progress of the fully customized application build.

65.       On November 11, 2019, following the long series of Thursday phone calls between DSI and Deployed, Mr. Cullinane sent an email to Deployed providing two updated and alternative timelines under SOW-2. Mr. Cullinane noted the following about these two timelines:

"I've attached two project plans.

DR_Timeline_11112019_STD – This is a project timeline for implementing our *standard product with no customization*, the go-live date would be 3.16.[2020].

DR_Timeline_11112019_Cus – This is a project timeline that takes into consideration *a potential need for customizations*, the go-live date would be 5.4.[2020]. This timeline includes 4 weeks of custom development. (emphases added)."

66.       Mr. Cullinane's email came nearly ten (10) months after DSI presented SOW-2 for a *Custom* Field Inventory Application, eight (8) months after Mr. DiBartolo represented to Deployed that a fully customized application would be created "from the ground up" under SOW-2, six (6) months after delivery of the First Schedule identifying the custom software builds that DSI would initiate between June and September of 2019, and one (1) month before the original "go live" date in the First Schedule.

67.       Mr. Cullinane's email demonstrated that DSI never had the intention or ability to build fully customized software "from the ground up".

68.       Nevertheless, in December 2019, DSI deployed test versions of some components of the software. However, these test versions were not fully customized software and were riddled

17

with bad code and little to no functionality. Deployed was unable to populate its asset inventory into these test versions because of the deficient functionality.

69.    Subsequent test versions of the software were also released by DSI in February 2020, and these versions were also not fully customized and were likewise riddled with functionality problems. Once again, Deployed was unable to populate its asset inventory into these test versions, as these test versions were unable to meet a basic threshold of functionality.

70.    Throughout the time period of SOW-2, DSI repeatedly proposed updated schedules that pushed back the "go live" date well beyond the "go live" date that appeared in the First Schedule. To date, DSI has not delivered a fully customized application to Deployed. In fact, DSI has not delivered any asset tracking applications to Deployed.

71.    Because Deployed has not received an asset tracking application from DSI, Deployed has not been able to utilize the Software in the Software License and has never received any benefit from the Software License.

### *Notice of Default and Notice of Termination*

72.    To date, DSI has failed to provide Deployed with any solution, whether *standard* or *custom*, that has allowed Deployed to integrate an asset tracking module with its ERP and NetSuite operating systems.

73.    Furthermore, Deployed has received virtually no benefit from any of the Software under the Software License. The Software License ostensibly granted a license to Deployed to *use* the Software identified on Attachment A of the Software License. However, none of the identified Software has ever been made available by DSI to Deployed in a usable format.

74.    Deployed has paid DSI $167,910 in license fees under the Software License and $247,060 in service fees under SOW-1 and SOW-2, for total payments from Deployed to DSI in

18

the amount of $414,970. Despite paying DSI this substantial amount of money, Deployed has nothing to show for it.

75.     In or about April 2020, it was becoming exceedingly apparent to Deployed that DSI was incapable of delivering an effective asset tracking module to Deployed. The concerns with DSI's inability to deliver an asset tracking module were referred up to Deployed's executive management team. Members of Deployed's executive management team had numerous phone conversations with designated employees of DSI about Deployed's complaints and concerns that DSI was not able to deliver an asset tracking module.

76.     On April 28, 2020, Mel Booker (CFO and member of the executive management team for Deployed) sent an email to DSI employees, including Messrs. Cullinane and DiBartolo, noting that the project was "heading down the wrong path" and that the "continual inability of DSI to meet our needs is beyond frustrating and [Deployed's] patience is mostly consumed." Mr. Booker demanded another phone call with DSI with a "detailed review of this project once again to fully understand what [Deployed] has been led to believe regarding the system that DSI is capable of delivering." Mr. Booker concluded the email by asking: "Why would [Deployed] invest huge sums of money to only get a system that is worse than what we already have…".

77.     On April 29, 2020, Mr. DiBartolo sent a return email indicating that he, the development leadership team, and DSI Chief Executive Officer Mark Goode had engaged in a meeting to understand the specific issues outlined by Mr. Booker in his April 28, 2020 email.

78.     On May 11, 2020, a phone conference was held between representatives of Deployed (including Mr. Booker, CFO and member of the executive management team at Deployed) and representatives of DSI (including Mr. Goode, CEO and member of the executive management at DSI) to discuss all the issues that had been complained of and outlined by Deployed

for months.

79.     After months of ongoing dialogue between representatives of Deployed and DSI about Deployed's complaints and concerns (including the May 11, 2020 phone conference) and because no discernable progress had been made during that same time period, on June 5, 2020, Deployed sent a Notice of Default to DSI based on DSI's failure to timely provide a functional asset tracking module integrated with its ERP and NetSuite systems.  In the Notice of Default, Deployed offered to provide DSI until August 14, 2020 (8 months after the "go live" date in the First Schedule, and 2 years after Deployed first approached DSI) to complete a list of tasks related to Deployed's previously articulated requirements, and if it could not do so, to refund Deployed all sums of money paid to date for the Software License, and 50% of the monies already paid to DSI under SOW-1 and SOW-2.

80.     DSI rejected Deployed's offer on June 10, 2020.

81.     On June 16, 2020, Deployed sent a Notice of Termination to DSI terminating and rescinding all agreements between Deployed and DSI and demanding return of the $414,970 paid to DSI, due to DSI's failure to ever provide a functional inventory asset solution to Deployed.

82.     The June 16, 2020 letter was sent by Deployed to DSI via email and certified United States mail, return receipt.  The June 16, 2020 letter requested a response from DSI on or before June 26, 2020.  DSI did not timely respond to the letter, and in fact, made no further comments or statements to Deployed until July 2, 2020 (after Deployed's Kansas City counsel reached out to DSI on July 1, 2020).

83.     Prior to filing this lawsuit, counsel for Deployed and DSI again discussed the dispute and steps that could be taken to avoid a lawsuit.  On July 9, 2020, counsel for Deployed sent a letter to counsel for DSI proposing steps that could be taken to stay consistent with the

20

purpose of pre-suit dispute resolution procedures in the Software License. This July 9, 2020 letter requested that DSI provide Deployed on or before July 17, 2020 with: (a) a commitment to a date certain by which all of the deliverables due to Deployed will be completed, and (b) compensation for the delay, lost time, and overpayment of license fees occurred by Deployed to date. The July 9, 2020 letter further noted that, upon receipt of a substantive proposal, Deployed would agree to arrange a meeting with executive management team members and counsel. However, Deployed also reserved the right to file its lawsuit after 30-business days from June 5, 2020, in the event that DSI provided an inadequate proposal in return.

84. Though DSI agreed to participate in Deployed's proposed procedures outlined in Paragraph 83, DSI failed to provide any proposal to Deployed by July, 17, 2020.

85. Instead, DSI provided a late proposal on July 21, 2020. This proposal, however, did not provide a commitment to a date certain by which all of the deliverables due to Deployed would be completed. Instead, this proposal contained numerous vaguely described tasks, multiple "TBDs" with respect to dates of important milestones to completion, and no indication as to the manhours required to actually complete the vaguely described tasks or provide the deliverables to Deployed.

86. The closest this proposal came to a commitment date was December 31, 2020— this would have marked approximately 29 months after Deployed first presented to DSI, and 12 months after the "go live" date in the First Schedule. As noted above, DSI signed Deployed up for a 36-month Software License that commenced in August of 2018 and, therefore, DSI's vaguely-defined proposal would have, at best, provided Deployed with only the final 6 months of benefits under the Software License. Notably, DSI's proposal did not offer any money back to Deployed.

87.     After it became readily apparent that Deployed's June 5 and July 9 proposals for attempting a resolution, coupled with DSI's wholly inadequate response to each of those proposals— all of which Deployed and DSI had both acknowledged and engaged in—were not able to resolve the dispute, Deployed filed this lawsuit.

*Defendants' Misrepresentations*

88.     On information and belief, neither DSI nor Messrs. DiBartolo, Cullinane, and Baldwin had any intention to provide Deployed with a functional cloud-based inventory solution. Instead, Defendants intended to string Deployed along to continue charging and receiving significant sums of money for service and license fees without providing Deployed any considerable benefit in return.

89.     On or before August 31, 2018 (the date Deployed entered into SOW-1 and the Software License), DSI and Messrs. DiBartolo, Cullinane, and Baldwin knew that its *standard* product was not conducive to and incapable of meeting the unique business needs and "wish list" from Deployed, and yet, these Defendants represented to Deployed that the *standard* product was suitable, in order to convince Deployed to enter into the Software License and SOW-1 and to pay substantial sums of money under each document without any ability for the *standard* product to meet the unique business needs and "wish list" of Deployed.

90.     This inability to meet Deployed's unique business needs and "wish list" with the *standard* product was apparent just three (3) months after SOW-1 was presented to Deployed, even though the information provided by Deployed at that later time was no different than the information provided by Deployed before SOW-1 was presented by DSI to Deployed.

91.     Despite the purported services offered under SOW-1 being incapable of meeting Deployed's unique business needs and "wish list", DSI did not refund any sums paid to Deployed

for its unsuitable *standard* product or the unusable Software under the Software License. Instead, Messrs. DiBartolo, Cullinane, and Baldwin devised a plan to keep Deployed on the hook for additional service and license fees by promising to provide *custom* product "from the ground up" to Deployed.

92.     Toward that end, instead of refunding Deployed's money and admitting that DSI was unable to assist Deployed with its asset inventory needs, DSI and Messrs. DiBartolo, Cullinane, and Baldwin proposed SOW-2 and sold it to Deployed as additionally required work calling for a fully customized product built "from the ground up".

93.     However, on or before March 7, 2019 (the date Deployed actually entered into SOW-2), DSI and Messrs. DiBartolo, Cullinane, and Baldwin knew that DSI lacked the ability and/or willingness to create a fully *custom* application for Deployed, and yet, DSI and Messrs. DiBartolo, Cullinane, and Baldwin represented to Deployed that it would build a fully *custom* application "from the ground up", in order to convince Deployed to enter into SOW-2 and to pay substantial sums of money under SOW-2 and to continue paying substantial sums of money under the Software License.

94.     DSI and Messrs. DiBartolo, Cullinane, and Baldwin made these representations without any intention or ability to construct a fully *custom* application "from the ground up" and without any of the Software ever being capable of use by Deployed. Within three months of the execution of SOW-2, Mr. Cullinane indicated that DSI was relying mostly on the *standard* product. Approximately eight months after execution of SOW-2, Mr. Cullinane indicated that Deployed had two options: (1) all *standard* product and no customizations, or (2) *standard* product with potential need for some customizations. It was apparent that DSI had no intention of or capability in creating a fully *custom* product "from the ground up".

23

95.     DSI knew that neither its *standard* application nor its falsely represented fully-*custom* application would ever suit the unique business needs of Deployed.  Instead, DSI engaged in a game of delay, always pushing back deadlines and pushing down expectations, so that Deployed would continue paying fees for non-deliverable services and functionally unusable software.  Deployed has been damaged by the misrepresentations and breaches of DSI and Messrs. DiBartolo, Cullinane, and Baldwin, in that Deployed continued to pay DSI substantial sums of money during DSI's game of delay, and today, Deployed has nothing to show for such substantial payments to DSI.

96.     In the alternative to the foregoing Paragraphs 88-95, Defendants failed to exercise reasonable care or competence when it made the false representations detailed above and herein.

## COUNT I
### Fraudulent Inducement – SOW-1 and Software License
### Against Defendants DSI, DiBartolo,
### Cullinane and Baldwin

97.     Deployed incorporates and restates its allegations in Paragraphs 1-96, as if fully set forth and stated herein.

98.     On August 31, 2018, Mr. DiBartolo, by and through the course and scope of his employment by DSI as Regional Sales Director, represented to Deployed that the *standard* product and corresponding DSI services proposed by SOW-1 were suitable to and capable in meeting the unique business needs and "wish list" of functionality features communicated by Deployed to Mr. DiBartolo.

99.     This representation by Mr. DiBartolo was demonstrably false, as evident from subsequent discussions regarding the same information which led DSI representatives to indicate that Deployed would require a *custom* product rather than a *standard* product.

100.    This representation by Mr. DiBartolo was material to the decision by Deployed to

engage DSI, as Deployed was intent on obtaining an asset tracking module that could integrate with its ERP and NetSuite.

101.    Mr. DiBartolo knew that his representation was false or he recklessly disregarded the truth of his representation at the time he made the representation.

102.    Mr. DiBartolo intended that his representation be relied upon by Deployed in consummating SOW-1 and the corresponding Software License with DSI.

103.    Messrs. Cullinane, and Baldwin reviewed SOW-1 and the Software License and ratified Mr. DiBartolo's untrue representations that the *standard* product and corresponding DSI services were suitable to and capable of meeting Deployed's unique business needs and "wish list".

104.    Deployed was unaware of the falsity of Mr. DiBartolo's representation and trusted and relied upon Mr. DiBartolo and other DSI representatives who were in a superior position to know whether the *standard* product and the corresponding DSI services were suitable to meet Deployed's unique business needs and "wish list".

105.    Deployed had a right to rely upon and did reply upon the representation of Mr. DiBartolo in deciding to enter into SOW-1 and the corresponding Software License and to pay the service and license fees thereunder to DSI.

106.    As a direct result of Deployed's reliance on the false representation of Mr. DiBartolo, Deployed was damaged in that Deployed entered into SOW-1 and the corresponding Software License and paid substantial sums of money in service and license fees with nothing to show for them.

107.    Upon information and belief, the representations and actions referenced in this Count I were made by employees and agents of DSI acting within the scope and course of their

25

employment and agency by DSI.

## COUNT II
### Fraudulent Inducement – SOW-2
### Against Defendants DSI, DiBartolo,
### Cullinane, and Baldwin

108.    Deployed incorporates and restates its allegations in Paragraphs 1-107, as if fully set forth and stated herein.

109.    On March 4, 2019, Mr. DiBartolo, by and through the course and scope of his employment by DSI as Regional Sales Director, represented to Deployed that the difference between SOW-1 and SOW-2 was that DSI, under SOW-2, would build a fully-customized application "from the ground up" to meet the unique business needs and "wish list" of Deployed. Mr. DiBartolo also represented that DSI was capable of building a fully-customized application "from the ground up", in that Mr. DiBartolo represented that DSI "could handle" all of the proposed additions.

110.    These representations by Mr. DiBartolo were demonstrably false, as evident from subsequent statements by Mr. Cullinane that DSI was relying mostly on the "standard product" and identifying two alternative paths under SOW-2—one that relied completely on the "standard product with no customization" and one that "takes into consideration a potential need for customizations", and as evident by DSI's absolute failure to deliver any asset tracking module to Deployed.

111.    These representations by Mr. DiBartolo were material to Deployed's decision to continue engaging DSI, as Deployed was intent on obtaining an asset tracking module that could integrate with its ERP and NetSuite and DSI was now informing Deployed that a standard application was not suitable and that a fully-customized application was required, capable of being created by DSI, and would meet Deployed's needs.

26

112. Mr. DiBartolo knew that his representations were false or he recklessly disregarded the truth of his representations at the time he made the representations.

113. Mr. DiBartolo intended that his representations be relied upon by Deployed in consummating SOW-2 and continuing to pay the license fees under the Software License that Deployed had not yet received any benefit from.

114. Messrs. Cullinane and Baldwin reviewed SOW-2 and ratified Mr. DiBartolo's untrue representations that DSI was capable of building a fully-customized application and would build a fully-customized application "from the ground up".

115. Deployed was unaware of the falsity of Mr. DiBartolo's representations and trusted and relied upon Mr. DiBartolo and other DSI representatives who were in a superior position to know whether a fully-customized application built from the ground up was required to meet Deployed's unique business needs and "wish list" and was capable of being completed by DSI.

116. Deployed had a right to rely upon and did reply upon the representations of Mr. DiBartolo in deciding to enter into SOW-2 and to pay the service fees thereunder, and did rely upon the representations of Mr. DiBartolo in continuing to pay the license fees under the Software License.

117. As a direct result of Deployed's reliance on the false representations of Mr. DiBartolo, Deployed was damaged in that Deployed entered into SOW-2 and paid substantial sums of money in service fees thereunder, continued paying substantial sums of money for license fees under the Software License, and has nothing to show for them.

118. At all times relevant, the representations and actions referenced in this Count II were made by employees and agents of DSI acting within the scope and course of their employment and agency by DSI.

## COUNT III
### *Fraudulent Misrepresentations*
### *Against Defendants DSI, DiBartolo,*
### *Cullinane, and Baldwin*

119.    Deployed incorporates and restates its allegations in Paragraphs 1-118, as if fully set forth and stated herein.

120.    In the alternative to Counts I and II, Messrs. DiBartolo, Cullinane, and Baldwin made or participated in the representations set forth above and as follows:

        a.  The ***standard*** product and corresponding services from DSI were all Deployed needed to have a functional asset tracking module to integrate with NetSuite and its ERP and to meet Deployed's unique business needs and "wish list";

        b.  The ***custom*** product was actually what Deployed needed in order to have a functional asset tracking module to integrate with NetSuite and its ERP and to meet Deployed's unique business needs and "wish list";

        c.  DSI was capable of and/or going to build a fully ***custom*** product "from the ground up" for Deployed; and

        d.  DSI was willing and/or capable of providing Deployed with a functional asset tracking module, whether as ***standard*** or ***custom*** product.

121.    All such misrepresentations were made by Messrs. DiBartolo, Cullinane, and Baldwin with the intent that Deployed rely on such representations in engaging and continuing to engage DSI and in paying significant sums of money to DSI for purported services and licenses.

122.    The representations set forth herein and above, including those set forth in Paragraphs 120(a) through (d), were demonstrably false and/or misleading.

123.    Messrs. DiBartolo, Cullinane, and Baldwin knew that their representations were false or they recklessly disregarded the truth of their representations at the time they made the

representations.

124.    The representations by Messrs. DiBartolo, Cullinane, and Baldwin were material to Deployed's decision to engage and continue engaging DSI, as Deployed was intent on obtaining an asset tracking module that could integrate with its ERP and NetSuite.

125.    Deployed was unaware of the falsity of the representations by Messrs. DiBartolo, Cullinane, and Baldwin, and trusted and relied upon these individuals who were in a superior position to know whether the standard product and corresponding DSI services were suitable to meet Deployed's unique business needs and "wish list", whether a fully-customized application built from the ground up was required to meet Deployed's unique business needs and "wish list", and whether a standard of custom product was even capable of being completed by DSI.

126.    Deployed had a right to rely and it was reasonable for Deployed to rely upon the representations of Messrs. DiBartolo, Cullinane, and Baldwin.  Deployed did, in fact, rely upon said representations in continuing to pay the significant service and license fees under SOW-1, SOW-2, and the Software License in order to attempt to obtain the software functionality it required.

127.    As a direct result of Deployed's reliance on the false representations set forth herein, Deployed was damaged in that Deployed paid substantial sums of money in service and license fees to DSI with nothing to show for them and incurred substantial lost time, and continues to incur substantial lost time, in pursuing a much needed asset tracking module for Deployed's asset intensive business.

128.    At all times relevant, the representations and actions referenced in this Complaint and in this Count III were made by employees and agents of DSI acting within the scope and course of their employment and agency by DSI.  Furthermore, the misrepresentations and action

referenced in this Complaint and in particular within this Count III herein were made in the area of responsibility of the individual defendants, who were primarily involved in selling and developing products to and for Deployed and in devising ways to generate ongoing revenue from Deployed. These individual defendants had actual and/or constructive knowledge of the wrongs being perpetrated against Deployed, and each of these individual defendants continued to engage in such wrongs at all times relevant to this Complaint.

## COUNT IV
### Negligent Misrepresentations for Inducement
### Against Defendants DSI, DiBartolo,
### Cullinane, and Baldwin

129.    Deployed incorporates and restates its allegations in Paragraphs 1-128, as if fully set forth and stated herein.

130.    In the alternative to Counts I, II, and III, Defendants failed to exercise reasonable care or competence when they made representations about their existing *standard* software product and their software configuration, implementation, and development capabilities in order to induce Deployed to enter into SOW-1, SOW-2, and the Software License.

131.    Based on their business relationship with Deployed, their purportedly long experience in the computer and software business, and the representations of their capabilities, Defendants had a duty to convey accurate and truthful information relating to their then-existing *standard* software product and their software configuration, implementation, and development capabilities. Defendants further had a duty to disclose to Deployed any pertinent limitations or issues Defendants had in this regard.

132.    Deployed reasonably relied on Defendants to provide truthful information relating to their existing *standard* software product and their software configuration, implementation, and development capabilities as Defendants had superior knowledge relating to that information and

30

the information could not have been discovered by Deployed through the exercise of ordinary diligence.

133.    The representations of Defendants relating to their existing ***standard*** software product and their software configuration, implementation, and development capabilities were false and/or misleading, and Defendants failed to exercise reasonable care or competence in communicating the information at the time the representations were made to Deployed.  Among other things, Defendants misrepresented the following:

a.    The ***standard*** product and corresponding services from DSI were all Deployed needed to have a functional asset tracking module to integrate with NetSuite and its ERP and to meet Deployed's unique business needs and "wish list";

b.    The ***custom*** product was actually what Deployed needed in order to have a functional asset tracking module to integrate with NetSuite and its ERP and to meet Deployed's unique business needs and "wish list";

c.    DSI was capable of and/or going to build a fully ***custom*** product "from the ground up" for Deployed; and

d.    DSI was willing and/or capable of providing Deployed with a functional asset tracking module, whether as ***standard*** or ***custom*** product.

134.    Contrary to Defendants' misrepresentations, Defendants did not have an adequate software platform which they could tailor to fit Deployed's needs, and Defendants did not have the skills, abilities, or experience to delivery a fully functional and customized asset tracking module to meet Deployed's needs.

135.    Deployed relied on these negligent misrepresentations to its detriment, having no reason to believe they were false, by entering into SOW-1, SOW-2, and the Software License,

31

which collectively resulted in approximately $414,970 in payments by Deployed to DSI and with nothing to show for such expenditures.

136.     Defendants' negligent misrepresentations consequently and proximately caused injury to Deployed.

137.     As a direct result of Deployed's reliance on the false representations set forth herein, Deployed was damaged in that Deployed paid substantial sums of money in service and license fees to DSI with nothing to show for them and incurred substantial lost time, and continues to incur substantial lost time, in pursuing a much needed asset tracking module for Deployed's asset intensive business.

138.     At all times relevant, the representations and actions referenced in this Complaint and in this Count IV were made by employees and agents of DSI acting within the scope and course of their employment and agency by DSI.  Furthermore, the misrepresentations and action referenced in this Complaint and in particular within this Count IV herein were made in the area of responsibility of the individual defendants, who were primarily involved in selling and developing products to and for Deployed and in devising ways to generate ongoing revenue from Deployed.  These individual defendants had actual and/or constructive knowledge of the negligent acts and/or wrongs being perpetrated against Deployed, and each of these individual defendants continued to engage in such negligent acts and/or wrongs at all times relevant to this Complaint.

**<u>COUNT V</u>**
***Breach of Contract***
***Against Defendant DSI***

139.     Deployed incorporates and restates its allegations in Paragraphs 1-138, as if fully set forth and stated herein.

140.     In the alternative to Counts I, II, III, and IV, SOW-1, SOW-2, and the Software

License formed contracts between Deployed and DSI.

141.   As part of those contracts, DSI was obligated to do the following:

    a.   Provide usable Software to Deployed under the Software License.

    b.   Perform all services under SOW-1 and SOW-2 in a workmanlike manner.

    c.   Provide Deployed with a functional asset module tracking application that could be integrated with its ERP and NetSuite.

142.   Deployed made all payments and performed all other obligations required of Deployed under the contracts up to and including the time of material breach by DSI.

143.   To the extent that the contracts are not rescinded and discarded in their entirety, Deployed has met all conditions precedent to filing this lawsuit and/or DSI waived all conditions precedent to filing this lawsuit by agreeing to and participating in the proposed steps outlined by Deployed in Paragraphs 83-87 herein.

144.   DSI breached its contractual obligations set out in Paragraphs 141(a), 141(b), and 141(c), in that DSI failed to provide usable Software to Deployed, failed to perform all services under SOW-1 and SOW-2 in a workmanlike manner, and failed to provide Deployed with a functional asset module tracking application that could be integrated with its ERP and NetSuite.

145.   All three of the breaches in Paragraph 141 were material breaches, as each of those three breaches go to the very root of the agreements between Deployed and DSI.

146.   As a direct result of DSI's breaches of the contracts, Deployed was damaged in that Deployed paid significant sums of money in service and license fees to DSI and Deployed has nothing to show for such expenditures.  In short, Deployed did not receive the benefit of its bargain with DSI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Deployed Resources, LLC ("Deployed") prays that this Court enter a judgement in its favor and against Defendants Data Systems International, Inc. ("DSI"), Brent DiBartolo, Benjamin Cullinane, and Mark Baldwin, as follows:

1. Finding and declaring that SOW-1, SOW-2, and the Software License are terminated and rescinded due to the fraudulent and/or negligent inducement by the Defendants outlined herein and that Defendants refund to Deployed the amount of at least $414,970, plus punitive and exemplary damages against all Defendants;

2. In the alternative, finding that DSI, DiBartolo, Cullinane, and Baldwin are liable for fraudulent and/or negligent misrepresentations and have damaged Deployed in the amount of at least $414,970, plus punitive and exemplary damages against all Defendants, jointly and severally;

3. In the alternative, finding that DSI has materially breached the contracts with Deployed, and finding and declaring that SOW-1, SOW-2, and the Software License are terminated and rescinded due to the material breaches by DSI outlined herein and that DSI refund to Deployed the amount of at least $414,970;

4. In the alternative, finding that DSI has breached the contracts with Deployed and has damaged Deployed in the amount of at least $414,970;

5. Plus all pre-judgment and post-judgment interest at the Missouri statutory rate, together with all costs, expenses, and fees allowable to the full extent of the law; and

6. Such other relief as this Court deems just and proper under the circumstances.

34

## JURY TRIAL DEMAND

Plaintiff Deployed respectfully demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

KENNYHERTZ PERRY, LLC

/s/ *Jeffrey Donoho*
Arthur Chaykin (Mo. Bar No. 42110)
Jeffrey T. Donoho (Mo. Bar No. 62852)
2000 Shawnee Mission Parkway, Suite 210
Mission Woods, KS 66205
Phone: (816) 527-9447
Fax: (855) 844-2914
arthur@kennyhertzperry.com
jeff.donoho@kennyhertzperry.com
**ATTORNEYS FOR PLAINTIFF**
**DEPLOYED RESOURCES, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2020, I electronically filed the preceding with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record, and provided an additional copy by electronic mail to Zach Chaffee-McClure, Esq., attorney for all defendants.

Respectfully submitted,

*s/ Jeffrey Donoho*
*Attorney for Plaintiff*