DocuSign Envelope ID: 6F67CD69-A701-481F-8847-7F594E78E875



# Software License, Services, and Maintenance Agreement

This Agreement is between Data Systems International, Inc. ("DSI®"), having its principal place of business at 1201 Walnut, Suite 1100, Kansas City, Missouri 64106, and <u>Deployed Resources LLC</u> ("Customer"), having its principal place of business at <u>164 McPike Rd, Rome, New York 13441 United States</u>. In consideration of the mutual promises in this document, DSI and Customer agree as follows (the "Agreement").

## ARTICLE I. DEFINITIONS

**Accessory Products**
Third party software or hardware delivered with the Licensed Products as a convenience to Customer, but not licensed under this Agreement. Customer's rights and warranties for Accessory Products shall reside exclusively with the original manufacturer of the software or hardware and not DSI. The license for third party software will be shipped to Customer by manufacturer.

**Affiliate**
Any entity, whether incorporated or not, which directly or indirectly is and remains controlled by the entity first identified as "Customer" above and executes an Affiliate Amendment to this Agreement. Control in an Affiliate requires ownership of more than fifty percent (50%) of: (i) voting stock of a company with voting stock, or (ii) ownership interest in any other enterprise. Customer agrees to confirm the Affiliate status of an entity upon request by DSI. In the event an Affiliate ceases to comply with this definition, this Agreement shall terminate solely as it relates to the former Affiliate in accordance with the termination provisions in this Agreement. For purposes of this Agreement, DSI's affiliates shall be any entity in which DSI has a ninety percent (90%) ownership interest, either directly or through a wholly owned subsidiary.

**Customer System**
Any server(s) of Customer's or other computer access devices on which the Licensed Products are installed or deployed, or which otherwise access the Licensed Products.

**Delivery**
The electronic transference of the Licensed Products and Documentation.

**Developed Software**
Any software developed for Customer by DSI under Article IV of this Agreement.

**Documentation**
The user, technical, and training documentation produced by DSI and related to a Licensed Product as effective on the date of Delivery of the particular Licensed Product.

**DSI**
The DSI entity which delivers products and services to Customer and submits associated invoices under this Agreement to Customer. Entities shall include Data Systems International, Inc. and its subsidiaries.

**Engagement Document**
Any signature required document including, but not limited, to any document titled Statement of Work, Scope of Engagement, Implementation Services Estimate, Initial Services Estimate, that details consulting services offered by DSI related to the Software.

**Licensed Products**
The software programs, including any updates provided, licensed by Customer under this Agreement. Licensed Products do not include Accessory Products, Developed Software or Your Developed Applications.

**Services**
The professional services, including without limitation, consulting, implementation, configuration, or installation services related to the Software offered by DSI.

**Software**
The Licensed Products, including any software updates provided as a part of Maintenance, and Developed Software.

**User**
An individual authorized to access the Software under this Agreement.

**Your Developed Applications**
Any independent or new application developed by Customer or Customer Representatives using the development tools

contained in the Licensed Products, including any non-Licensed Product code with respect to such Customer developed application.

Unless otherwise specified, all days referred to are calendar days. All references to Customer shall mean Customer and its Affiliates.

## ARTICLE II. LICENSE

**License Grant**
Subject to the terms and conditions of, and payment to DSI by Customer of all license fees under, this Agreement:
**1**. DSI grants to Customer a non-exclusive, non-transferable, perpetual, limited license to use the Software and Documentation on the Customer System(s) for Customer's internal business operations.
**2**. DSI grants to Customer the right to create Your Developed Applications for Customer's internal business operations. DSI shall own all Licensed Products used in creating Your Developed Applications. DSI acquires no right, title or interest from Customer under this Agreement in or to Your Developed Applications, including any Customer intellectual property rights therein. Customer specifically acknowledges that DSI may develop and publish applications that are similar to or otherwise compete with Your Developed Applications provided such DSI applications do not utilize any Disclosed Information as defined under Article VI.

**License Restrictions**
**1**. Access to the Software is limited to those categories below who have been licensed as a User (collectively "Customer Representatives"):
   (i) employees of Customer;
   (ii) independent contractors engaged by Customer who require access to the Software to perform their tasks; and
   (iii) distributors, vendors, and customers of Customer.
**2**. Customer shall be responsible for the acts and omissions of Customer Representatives arising from the Software access provided by Customer.
**3.** For any access to the Software other than by an employee of Customer, Customer shall only provide such access if the party has entered into a non-disclosure agreement with Customer and Customer accepts full responsibility for the acts and omissions of such party.
**4.** Access to the Software may not be provided to any individual or entity where such access is the primary purpose or value of the relationship. By way of example, and not limitation, the Software may not be provided or used by Customer for a timeshare, service bureau, third party training, or similar arrangement.
**5.** Customer may provide a copy of or access to the Software to a third-party organization providing data center, hosting or disaster recovery services on a computer system furnished for such purpose by a third-party organization, provided that Customer and such third party enter into a non-disclosure agreement. Customer shall provide DSI any required server information and, agrees to be fully responsible to DSI for all damages for any unauthorized use, disclosure, or duplication of the Software resulting from its possession by the third-party organization.
**6.** Customer shall not utilize any device or program to enable access to the Software in a manner such that the individual accessing the Software is not counted as a User as that term is used in any user-based licensing restrictions in this Agreement.
**7.** DSI may restrict the Software's distribution by Customer to a particular geographic destination outside of the United States, if DSI reasonably believes it necessary to protect its intellectual property rights. Additionally, DSI and the U.S. State Department restricts the direct or indirect distribution, exportation or re-exportation of Software, technical data and the direct product thereof to those countries on the U.S. State Department's embargoed or restricted destinations list.
**8.** Customer shall not, or cause anyone else to:
   (i) reverse engineer, disassemble, decompile, or otherwise attempt to discover the source code of any part of the Software, provided however, that if the Software is located in a jurisdiction whose laws explicitly permit some form of reverse engineering, Customer may do so solely to the extent so permitted by such law to achieve interoperability with other software, and Customer agrees to notify DSI prior to doing so;
   (ii) rent, lease, sublicense, or otherwise transfer any of the Software;
   (iii) copy the Documentation or Software except to the extent necessary for Customer's archival needs and to support the Users. All such copies shall be subject to this Agreement and contain all proprietary legends that appeared on or in the original; or
   (iv) Remove or deface any proprietary legends on or in the Software.

Data Systems International, Inc.
Confidential -Version 04.19.2018 V0
Copyright © 2018 Data Systems International, Inc. All rights reserved.     Page 2 of 8     SLSM AGMT



**9**. The Licensed Products contain license protection procedures that limit access to the Software to that use which is permitted under this Agreement ("Software Protection Procedures"). The Software Protection Procedures will not destroy or damage any of Customer's data or software. Customer shall not circumvent or render inoperative the Software Protection Procedures.

**10.** Customer may only use the Licensed Products that Customer has licensed from DSI under this Agreement, even though, upon receipt, the media may contain additional applications or modules.

**11.** On DSI's request, not more frequently than annually, Customer shall furnish DSI with a signed certification verifying that the use of the Software is consistent with this Agreement and listing the locations and types of any servers on which the Software is installed or utilized as well as the Users. DSI, not more frequently than annually and at its own expense, may audit Customer's use of the Software to verify compliance with this Agreement. Any audit will be conducted in a manner that avoids unreasonable interference with Customer's business operations. If a certificate or an audit reveals that Customer has underpaid fees to DSI, Customer shall be invoiced for such underpaid fees at DSI's then-current list prices or Customer may elect to deactivate the licenses associated with non-compliance. If the underpaid fees exceed five percent (5%) of the actual fees paid, then Customer also shall pay DSI's reasonable costs of conducting the audit.

**12.** DSI retains all ownership rights to the Documentation and Software. All rights not explicitly granted in this Agreement are reserved by DSI.

### ARTICLE III. SOFTWARE MAINTENANCE AND SUPPORT

**1.** Customer may elect to receive software maintenance and support offered by DSI for the Licensed Products ("Maintenance"). Any such Maintenance will be provided under the terms of this Agreement as further modified by DSI's policies in effect at the beginning of each maintenance period (the "Period of Coverage"). If Customer elects to receive Maintenance, the first Period of Coverage shall begin upon the Effective Date of this Agreement. Customer may not exclude any of the Licensed Products from Maintenance. Unless canceled by either party by written notice no less than thirty (30) days prior to the end of the Period of Coverage, Customer agrees that the Period of Coverage for Maintenance shall automatically extend for one (1) year at DSI's then current maintenance fee percentage.

**2.** Customer shall establish and maintain an internal competency center or help desk to provide a central point of contact with DSI for any Maintenance services. Customer shall be responsible for installing any updates to the Licensed Products provided to Customer by DSI. Customer shall cooperate with DSI in providing access to Customer Systems to the extent required to diagnose and/or resolve issues identified by Customer concerning the Licensed Products.

**3.** If Customer provides DSI with reports of defects in the Licensed Products or any changes or modifications proposed or suggested by Customer (collectively "Customer Feedback"), DSI shall have the right to use such Customer Feedback including, without limitation, the incorporation of such Customer Feedback into DSI's software products without any obligation to Customer.

### ARTICLE IV. SERVICES

**1.** Customer may elect to receive Services from DSI. Any such Services will be provided under the terms of this Agreement incorporating by reference any further terms contained in a mutually agreed upon Engagement Document.

**2.** DSI shall own all right, title and interest in and to Developed Software and any documentation delivered with the Developed Software. The Developed Software and associated documentation shall not be a "work made for hire" or a "specially commissioned work" as these terms are used in United States copyright law.

**3.** The Services supplied by DSI under this Article IV shall be performed in a professional and workmanlike manner. However, DSI shall have no responsibility for problems caused by alterations or modifications made by Customer or a third party to the Software, or arising out of the malfunction of Customer's equipment, network or other software products not licensed by DSI.

**4.** DSI may subcontract the performance of any Services. DSI shall be responsible for Services performed by its subcontractors.

**5.** Customer acknowledges that consulting services may be obtained from third parties, and that Customer's decision to purchase Services from DSI is made independently of Customer's decision to license DSI's Licensed Products.

### ARTICLE V. TRAINING

Customer may elect to receive training related to the Licensed Products, which is offered by DSI ("Training"). Any such Training will be provided under the terms of this Agreement and under DSI's Training policies and pricing in effect at the time of Training.



### ARTICLE VI. MUTUAL NON-DISCLOSURE

**1.** Each party to this Agreement may furnish the other party to this Agreement with certain proprietary or nonpublic information (the "Disclosed Information"). The furnishing party shall be the "Discloser" and the receiving party shall be the 'Recipient". For purposes of this Agreement,
Confidential Information is defined as:
  (i) Disclosed Information in printed, written, graphic, photographic or other tangible form marked as "Confidential," "Proprietary," "Private," "Restricted," or "Trade Secret" by Discloser;
  (ii) Disclosed Information in oral or demonstrative form, recorded as written minutes or notes of such presentations, which minutes or notes must be so marked and provided to Recipient within thirty (30) days after the date of disclosure of the Disclosed Information;
  (iii) Disclosed Information relating to unreleased products;
  (iv) the terms and conditions of this Agreement; and
  (v) the Software.

**2.** Confidential Information shall not include information that:
  (i) is or becomes part of the public domain without violation of this Agreement by Recipient;
  (ii) is already in Recipient's possession free of any restriction on use or disclosure;
  (iii) becomes available to Recipient from a third party provided that such party was free from restriction on disclosure of the information; or
  (iv) has been independently developed by Recipient.

**3.** If Recipient is required by legal proceeding discovery request, "open records" or equivalent request, investigative demand, subpoena, court or government order to disclose Confidential Information, Recipient may disclose such Confidential Information provided that:
  (i) the disclosure is limited to the extent and purpose legally required; and
  (ii) prior to any disclosure and if permitted by applicable law, Recipient shall immediately notify Discloser in writing of the existence, terms, and conditions of the required disclosure and, at Discloser's request and expense, cooperate in obtaining a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

**4.** Recipient shall hold the Confidential Information in confidence and only disclose the Confidential Information to its officers, employees, consultants, counsel, affiliates, independent contractors, or agents (collectively "Representatives") who:
  (i) need the Confidential Information to assist the Recipient with performing its obligations or exercising its rights under this Agreement;
  (ii) have been instructed not to disclose the Confidential Information; and
  (iii) for other than Recipient's employees, have executed a nondisclosure or confidentiality agreement with Recipient at least as protective as this Agreement of the Confidential Information of Discloser.

Recipient shall be responsible for any violation of this Agreement by its Representatives and shall use reasonable efforts to restrain its Representatives (including Representatives who, subsequent to the date of this Agreement, become former Representatives) from unauthorized use or disclosure of the Confidential Information.

**5.** All Confidential Information shall, between Discloser and Recipient, remain the property of Discloser. Upon termination of this Agreement and upon Discloser's written request, Recipient shall promptly return all Disclosed Information of Discloser and destroy, and provide written certification to Discloser of such destruction, all other materials embodying the Disclosed Information of Discloser.

**6.** Recipient may at any time independently develop information similar to, or products and services that compete with products or services identified in, the Disclosed Information.

**7.** The parties stipulate that a breach of this Article VI by Recipient will cause immediate and irreparable harm and significant injury to Discloser, for which there is no adequate remedy at law and that Discloser shall be entitled, in addition to any other rights and remedies it may have, to injunctive relief, specific performance and other equitable remedies to restrain any threatened, continuing, or further breach of this Article VI. Recipient shall immediately advise Discloser of any discovered breach by Recipient or its Representatives of this Agreement and shall reasonably cooperate, at Recipient's expense, with Discloser in retrieving the disclosed Confidential Information and restricting any continuing breach.

### ARTICLE VII. WARRANTY, CLAIMS, REMEDY AND EXCLUSIONS

**1.** DSI warrants that the Licensed Products will perform substantially in accordance with the Documentation for the particular Licensed Product (the "Licensed Products Warranty"). The term of this warranty is a period of six (6) months following the first date of Delivery of Licensed Products to Customer's first designated site ("Initial Warranty"). If Customer purchases



Maintenance from DSI, this warranty will also be in force during any Period of Coverage (each a "Supplemental Warranty").

**2.** Customer shall notify DSI of any claim under the Licensed Products Warranty during the Initial Warranty or any Supplement Warranty (when given, a "Warranty Notice"). Such notice shall be given with sufficient information and time to allow DSI to duplicate the error.

**3.** For any claim under the warranty in this Article VII, DSI's sole obligation shall be, without additional charge, to correct the substantial non-conformance identified in the Warranty Notice or provide a mutually acceptable plan for correction no later than sixty (60) days following the receipt of Warranty Notice (the "Resolution Deadline"). Should DSI fail to provide such correction or mutually acceptable plan by the Resolution Deadline, Customer, as its sole remedy:

  (i) if during the Initial Warranty, may elect to terminate this Agreement and receive a refund of all fees listed on any Licensed Product Attachment hereto corresponding to the licensing of the Licensed Products and Users, by notifying DSI within fifteen (15) days following the Resolution Deadline; and

  (ii) if during the Supplemental Warranty, DSI shall provide Customer, upon Customer's written request, a refund of all fees paid for Maintenance for the particular Licensed Product for the Period of Coverage in which the claim arose.

**4.** The warranty in this Article is not applicable to claims arising out of:
  (i) releases of the Licensed Products other than the most current release;
  (ii) alterations or modifications to the Licensed Products made by anyone other than DSI;
  (iii) Your Developed Applications;
  (iv) Accessory Products;
  (v) malfunctions of Customer Systems; or
  (vi) combination, operation, or use of the Licensed Products with other equipment, devices, or software not supplied by DSI or approved by DSI in its Documentation.

**5.** CUSTOMER ASSUMES RESPONSIBILITY FOR COMPLIANCE WITH THE MINIMUM TECHNICAL REQUIREMENTS FOR HARDWARE AND SOFTWARE AND FOR SELECTION OF THE LICENSED PRODUCTS TO ACHIEVE CUSTOMER'S INTENDED RESULTS. DSI MAKES NO WARRANTY AS TO THE ADEQUACY OR CAPACITY OF ANY HARDWARE OR THIRD-PARTY SOFTWARE TO ATTAIN SOME OR ALL OF THE PERFORMANCE OBJECTIVES OF CUSTOMER. EXCEPT FOR THOSE WARRANTIES EXPRESSLY PROVIDED IN THIS ARTICLE VII, ALL OTHER WARRANTIES. EITHER EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY EXCLUDED.

## ARTICLE VIII. LIMITATION OF LIABILITY

1. DSI'S LIABILITY FOR DAMAGES UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT OF THE FEES PAID BY CUSTOMER FOR THE RELEVANT LICENSED PRODUCT(S), MAINTENANCE OR TRAINING GIVING RISE TO THE LIABILITY. UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND EXCEPT FOR A BREACH OF ARTICLE VI OR ANY BREACH OF DSI'S INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, PROFITS, DATA, (OR USE THEREOF), OR BUSINESS INTERRUPTION ARISING OUT OF EITHER PARTY'S ACT OR FAILURE TO ACT, WHETHER SUCH DAMAGES ARE LABELED IN TORT, CONTRACT, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE LIMITATIONS SET FORTH IN THIS SECTION SHALL APPLY EVEN IF ANY EXCLUSIVE REMEDY IN THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.

## ARTICLE IX. INFRINGEMENT CLAIMS

1. DSI shall indemnify, defend, and hold Customer harmless against any loss, liability, cost, or expense related to any third-party claim alleging intellectual property infringement or misappropriation related to the Licensed Products. DSI's obligation under the preceding sentence is conditioned on Customer promptly notifying DSI of any claim, demand, or action for which indemnity is sought, granting to DSI the sole authority to defend or settle the claim, and cooperating fully, at DSI's expense, in the defense or settlement of any such claim.

2. If Customer is prevented from using the Licensed Products due to a claim of intellectual property infringement or misappropriation by a third party, DSI shall, at its expense:
  (i) procure for Customer the right to continue to use the Licensed Products; or
  (ii) replace or modify the Licensed Products so they are no longer covered by the claim while retaining substantially similar functionality.

In the event neither (i) nor (ii) (above) are commercially feasible, DSI may, by written notice to the Customer, terminate the license rights for such Licensed Products and refund a pro rata portion of the amount paid by Customer for such Licensed Products based on a five (5) year depreciation schedule beginning upon Delivery of the Licensed Products to Customer.



Sections 1 and 2 of this Article IX constitute DSI's entire obligation to Customer with respect to any third-party claim of infringement and is given to Customer solely for its benefit.

**3.** DSI shall have no liability for any claims of intellectual property infringement or misappropriation that arise out of:
 (i) alterations or modifications to the Licensed Products made by anyone other than DSI;
 (ii) Your Developed Applications;
 (ii) the use of a release of the Licensed Products prior to the current release if the claim for which indemnity is sought could have been avoided by the use of a current release;
 (iii) the combination, operation, or use of the Licensed Products with equipment, devices, or software not supplied by DSI or approved by DSI in its Documentation; or
 (iv) a use of the Licensed Products in a manner not contemplated within the Documentation.

**4.** Customer shall indemnify, defend and hold DSI harmless against any loss, liability, cost or expense related to any third-party claim alleging intellectual property infringement or misappropriation related to Your Developed Applications. Customer's obligation under the preceding is conditioned on DSI promptly notifying Customer of any claim, demand or action for which indemnity is sought, granting Customer the sole authority to defend or settle the claim, and cooperating fully, at Customer's expense, in the defense or settlement of any such claim.

## ARTICLE X. PAYMENT

**1**. Unless otherwise stated on an Attachment to this Agreement under which license fees become due, Customer shall pay one hundred percent (100%) of any license fees and applicable taxes required within thirty (30) days of invoice date.

**2.** Customer agrees to pay Maintenance fees in accordance with any Attachment to this Agreement and subsequently as an annual charge. Payment for Maintenance fees shall be due within thirty (30) days of invoice date. If Customer fails to remit Maintenance fees, DSI will have no duty to provide Maintenance under Article III.

**3.** Unless otherwise mutually agreed in an Engagement Document, Customer agrees to pay DSI for Services on a per hour basis based on the individual required and the actual hours expended. Additionally, Customer agrees to reimburse DSI for all reasonable out-of-pocket expenses DSI incurs in providing Services including, but not limited to, transportation costs, airfare, rental vehicles, lodging, meals, and incidental charges, which are reimbursable expenses and not part of DSI's total estimate for the Services. DSI shall make all reasonable efforts to coordinate travel with Customer so as to take advantage of Customer's preferred rates. Payment for Services fees and associated out-of-pocket expenses shall be due within thirty (30) days of invoice date. If Customer fails to remit payment for such fees, DSI may, at its option, cease to perform consulting services under this Agreement until such amounts are paid.

**4.** Customer shall pay DSI for any Training received at the then current pricing in accordance with Training policies.

**5.** Customer shall be solely responsible for all invoice processing fees billed by Customer's third party service providers, if applicable, and taxes related to items or services provided to it by DSI under this Agreement including, by way of example and not limitation, import duties and fees, sales, use, property, excise, value added, and gross receipts ("Taxes"). In the event that Customer is required by any withholding tax or other similar law to deduct any amount from the amounts due to DSI under this Agreement, Customer agrees that it shall pay a sufficiently higher amount so that the net amounts received by DSI after such withholding equal what was invoiced. Notwithstanding anything to the contrary in this section, DSI shall be solely responsible for all taxes based on its personal property and net income.

**6.** Customer shall pay DSI interest at the rate of one and one-half percent (1½%) per month or, if less, the highest amount permitted by law, from the due date on any undisputed payment due under this Agreement not received by DSI on the due date.

**7.** Invoices shall be submitted to Customer by the appropriate DSI entity based upon the currency identified in the applicable Attachment or Engagement Document and Customer shall remit payment for such invoices to the invoicing DSI entity and to the designated bank in the currency indicated on the invoice. All invoices to Customer will be sent to Customer's address appearing in this Agreement. All payments made are nonrefundable except as provided herein.

## ARTICLE XI. GENERAL

**1.** This Agreement is a licensing and services agreement and not a sale of goods. This Agreement shall not be subject to the United Nations Convention on Contracts for the Sale of Goods. No action arising out of or related to this Agreement may be brought more than one (1) year after the claiming party knew or should have known, excluding actions related to non-payment of fees due under this Agreement.

**2.** This Agreement shall be governed and construed in accordance with the laws of the State of Missouri and the United States of America without regard to its conflict of laws provisions. The parties agree that any controversy, claim or litigation arising out of or in connection with this Agreement shall be resolved in a federal or state court in the State of Missouri, and

consent to the jurisdiction of such court over the parties hereto and such controversy, claim or litigation.

**3.** Before initiating any legal claim or action (except with respect to equitable relief), the parties agree to attempt in good faith to settle any dispute, controversy or claim arising out of or related to this Agreement (collectively, a "Claim") through discussions which shall be initiated upon written notice of a Claim by either party to the other party. If the parties cannot come to a mutually agreeable resolution of the Claim within ten (10) business days, then such Claim shall be referred to members of the parties' executive management (each such member a "Representative") for resolution, which referral shall be evidenced by a written notice from either party to the other (the "Referral"). The parties' representatives shall meet within ten (10) business days of such Referral. If the parties have not reached a mutually agreeable resolution of the Claim within thirty (30) business days after their initial meeting, then either party may pursue its rights and remedies available at law or in equity.

**4.** This Agreement shall commence on the Effective Date and shall continue until terminated as permitted below. Customer may terminate this Agreement, for any reason or no reason at all, by providing DSI with thirty (30) days notice.

**5.** If Customer violates this Agreement, DSI, in addition to any other rights available to it in law or equity, may give written notice of its desire to terminate and the specific grounds for termination to Customer. Following the giving of such notice, this Agreement will then terminate if the Customer fails to cure the breach within thirty (30) days of the notice. If such default is incapable of cure, this Agreement will terminate immediately upon notice.

**6.** Either party may terminate this Agreement effective immediately by giving written notice to the other party if the other party becomes insolvent, admits a general inability to pay its debts as they come due, or makes an assignment for the benefit of creditors or a petition under any bankruptcy act is filed by the other party or such a petition is filed by any third party or an application for a receiver of the other party is made by anyone and such petition or application is not dismissed within sixty (60) days.

**7.** Upon any termination of this Agreement, Customer shall provide DSI with all outstanding payments due and, within ten (10) days of the termination, uninstall the Documentation and Software and return same to DSI or destroy the Documentation and Software and provide written certification of such destruction to DSI. Articles VI, VII, sections 3, 4, and 5, VIII, IX and XI, sections 1, 2, 3, 7, and 8 of this Agreement shall survive any termination.

**8.** Customer shall not export, re-export, or otherwise transmit, directly or indirectly, any software, information, data, or other materials received under this Agreement except in full compliance with all United States and other applicable acts, laws, and regulations. Customer shall indemnify, defend and hold harmless DSI from any loss, liability, cost or expense (including reasonable legal fees) related to any action arising from Customer's failure to comply with this section.

**9.** The Licensed Products and Documentation are provided to Customer as a commercial item strictly under the terms and conditions of this Agreement and include only those rights customarily available to the public. The Customer is not authorized to permit disclosure by any agency or other part of the Federal Government that exceeds in any way the use and disclosure rights (i) conveyed to Customer in this Agreement; or (ii) provided in FAR 12.212 (Computer Software) and (for Department of Defense use or disclosure) DFAR 227.7202-3 (Rights in Commercial Computer Software or Computer Software Documentation), whichever set of rights provided in (i) or (ii) are the more restrictive. If an agency or other part of the Federal Government has a need for rights not conveyed under this Agreement, it must negotiate with DSI for the transfer of such rights.

**10.** Neither party, including its Affiliates, shall recruit or solicit, employ or otherwise engage an employee of other party during, and for a period of six (6) months following any termination of, the particular employee's employment with the other party. Should a party violate this provision, the violating party shall pay the other party one hundred percent (100%) of the former employee's annual base salary with the non-violating party as damages for the violation. Such payment shall be the non-violating party's sole remedy with respect to the violating party.

**11.** All notices required or permitted to be given shall be in writing sent by courier or certified mail, return receipt requested, to the recipients at the addresses contained in this Agreement or to such other recipients as the parties may specify from time to time by written notice to the other party, and deemed to be effective upon delivery.

**12.** This Agreement and any attached exhibits, addenda, Attachments and amendments, each of which is hereby incorporated by reference, constitute the complete and exclusive agreement between the parties concerning the subject matter of this Agreement and supersede any prior or contemporaneous communication regarding the subject matter of this Agreement.

**13.** Any modification of any term or condition of this Agreement shall be effective only if in writing and signed by authorized representatives of both parties. No other act, usage, or custom shall be deemed to modify this Agreement.

**14.** Any waiver of any default or breach of this Agreement shall be effective only if in writing and signed by an authorized representative of the party providing the waiver. No such waiver shall be deemed to be a waiver of any other or subsequent breach or default.

DocuSign Envelope ID: 6F67CD69-A701-481F-8847-7F594E78E875

15. If any provision of this Agreement is held to be invalid, the remaining portions of this Agreement shall remain in full force.

16. Neither party shall be in default under this Agreement by reason of its delay in the performance of, or failure to perform, any of its obligations under this Agreement, if, and to the extent that, such delay or failure is caused by strikes, natural disasters, acts of the public enemy or government actions or acts of terrorism. Upon claiming any excuse or delay under this section, such party shall promptly notify the other party, use reasonable efforts to remove the cause, and continue its performance under this Agreement whenever the cause is removed.

17. If a version of this Agreement is provided in a language other than English and there is an inconsistency between the terms and conditions of the two versions, the English version shall control. The exchange of a fully executed Agreement by facsimile or other electronic means of communication, whether by separately executed counterparts or otherwise, shall be binding on the parties.

18. Upon execution of this Agreement, DSI is entitled to announce that the Customer is now a client of DSI and provide a general description of the assignment through press release, web announcement, or some other form. Terms of the engagement will be kept confidential. Subsequent publicity will be allowed as work is made public by Customer.

19. Customer understands that DSI's business partners are independent third-party entities and, except to the extent they are acting as subcontractors pursuant to Article IV, section 4 of this Agreement, DSI is not liable for nor bound by any acts of such business partner.

20. This Agreement does not constitute and shall not be construed as constituting a partnership, agency, distributorship, or joint venture between the parties. Neither party shall have any right to obligate or bind the other party in any manner whatsoever and nothing herein shall give, or is intended to give, any rights of any kind to any third persons, except as specifically provided in the preamble to this Agreement.

21. Any purchase order or other instrument of Customer accompanying either an Attachment to this Agreement or a Customer payment is for Customer's internal use only and its terms shall not alter or amend the terms of this Agreement, any additional or varying terms contained in such instrument being expressly rejected.

**EACH PARTY REPRESENTS THAT IT HAS FULL AUTHORITY AND POWER TO ENTER INTO AND PERFORM UNDER THIS AGREEMENT, AND THAT THE PERSON SIGNING ON BEHALF OF EACH HAS BEEN PROPERLY AUTHORIZED AND EMPOWERED TO ENTER INTO THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT, UNDERSTANDS IT, AND AGREES TO BE BOUND BY IT.**

By execution, signer certifies that signer is authorized to accept and execute this Agreement on behalf of DSI.

Signed by DSI and effective as of ___August 31, 2018___
("Effective Date")

By execution, signer certifies that signer is authorized to accept and execute this Agreement on behalf of Customer.

Date signed: ___August 31, 2018___

**DATA SYSTEMS INTERNATIONAL, INC.**

By: _(DocuSigned by: /s/ — 471A3B650F6D4B9...)_
Print Name: Mark L. Baldwin
Title: CFO & General Counsel

**DEPLOYED RESOURCES LLC**

By: _(DocuSigned by: Mel P Booker III — 591E66EFC00549D...)_
Print Name: Mel P Booker III
Title: CFO

Data Systems International, Inc.
Confidential -Version 04.19.2018 V0
Copyright © 2018 Data Systems International, Inc. All rights reserved.
Page 8 of 8
SLSM AGMT

Case 4:20-cv-00607-HFS   Document 18-1   Filed 10/07/20   Page 8 of 10

DSI®  
Data Systems International, Inc.

1201 Walnut, Suite 1100  
Kansas City, MO 64106

# SOFTWARE LICENSE, SERVICES AND MAINTENANCE AGREEMENT
# ATTACHMENT A 8374
(TERM LICENSE)

**Customer:** Deployed Resources LLC  
**Address:** 164 McPike Rd,  
Rome, New York  13441  
United States

**TERM LICENSE GRANT:** Data Systems International, Inc. (DSI®), grants to Customer, and Customer accepts, subject to the terms and conditions set out in the Agreement and this Attachment A, a non-exclusive, non-assignable, and non-transferable limited term license to use solely for Customer's internal business operations the Licensed Products noted below commencing upon the Effective Date of this Attachment A and continuing through the Term Period stated below. Upon the end of the Term Period, Customer's right to access and use the Licensed Products below will terminate unless renewed for an additional Term Period.

### LICENSED PRODUCTS (Term Only):

| Qty | Description | Term (# of Months) | Term Period Start Date | Term Period End Date |
|---|---|---|---|---|
| 1 | Cloud Mobile Supply Chain Platform (ADC Platform/Mobile Platform/App Servers/AIM Server/Wire) | 36 | 9/1/2018 | 8/31/2021 |
| 1 | Cloud Integration Suite for NetSuite: Interfaces for Inventory Management, Sales Order Management, Procurement Management, Manufacturing Management, Warehouse Management, Transportation Management, Asset Management and Payroll Management | 36 | 9/1/2018 | 8/31/2021 |
| 1 | Cloud Connect Interface to ERP | 36 | 9/1/2018 | 8/31/2021 |
| 1 | Cloud Field Service Application | 36 | 9/1/2018 | 8/31/2021 |
| 1 | Cloud Inventory Solution: Item Master, Inventory Transfer, Cycle Count, AIM Sessions/Users (as required) | 36 | 9/1/2018 | 8/31/2021 |
| 50 | Cloud Inventory User License | 36 | 9/1/2018 | 8/31/2021 |
| 1 | Insights (Accessory Product) Annual Base Package Subscription includes 3 Power Users and all published dashboards (Platform Metrics and Operational Insights). Power Users have the ability to modify (save as) the published dashboards and create new content from each Insights data model. Services are required for initial setup and configuration. | 36 | 9/1/2018 | 8/31/2021 |
| 1 | Administration Subscription, Online Self-Paced Training | 12 | 9/1/2018 | 8/31/2019 |

**TOTAL TERM LICENSE FEE¹** *(Excludes any applicable taxes)* — **USD 233,600.00**

¹Annual Term License Fee includes Maintenance.

*Customer may elect to install the Licensed Products on Customer's System defined as any server(s) provided by Customer, Customer's third-party service provider or DSI's third party service provider, or other computer access devices on which the Licensed Products are installed or deployed, or which otherwise access the Licensed Products.  Hosting services available from DSI through its third-party hosting service provider, currently Amazon.com through AWS, are detailed in Exhibits 1, 2, 3, 4 and 5 (attached hereto) and DSI shall use commercially reasonable efforts to make the third-party hosting services provided through Amazon.com available to Customer 24 hours per day, 7 days per week and in accordance with DSI's contractual obligations with Amazon.com.*

X 

 By DSI

_____ MPBlll By Customer

CONFIDENTIAL: Software License, Services and Maintenance Agreement - Attachment A for Term License  
Copyright © 2018 Data Systems International, Inc. All rights reserved.

SOFTWARE LICENSE, SERVICES AND MAINTENANCE AGREEMENT - ATTACHMENT A FOR TERM LICENSE

**PAYMENT TERMS:**

| | |
|---|---|
| **USD 79,200.00** | Payable within 30 days of invoice date for the Term Period of 9/1/2018 through 8/31/2019 |
| **USD 77,200.00** | Due on or before 8/25/2019 for the Term Period of 9/1/2019 through 8/31/2020 |
| **USD 77,200.00** | Due on or before 8/25/2020 for the Term Period of 9/1/2020 through 8/31/2021 |

**FUTURE PRICING – ADDITONAL LICENSED PRODUCTS:**

*DSI agrees to extend to Customer during the Term Period stated herein, a term license fee of USD 112.00 per license per month for additional Cloud Inventory User Licenses acquired by Customer. Fees for such additional Licensed Products shall be pro-rated bases on the End Date of the Term Period.*

THIS ATTACHMENT, INCLUDING ITS TERMS AND CONDITIONS, AND THE AGREEMENT OF WHICH IT IS A PART, IS A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PRIOR OR CONCURRENT PROPOSALS AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS ATTACHMENT AND THE AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE AGREEMENT, IN THE EVENT OF A CONFLICT BETWEEN THIS ATTACHMENT AND THE AGREEMENT, THIS ATTACHMENT SHALL PREVAIL. ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED AND ARE RATIFIED HEREBY. THIS ATTACHMENT SHALL NOT BE EFFECTIVE UNTIL EXECUTED BY CUSTOMER AND ACCEPTED BY AN AUTHORIZED REPRESENTATIVE OF DSI.

**EACH PARTY REPRESENTS THAT IT HAS FULL AUTHORITY AND POWER TO ENTER INTO AND PERFORM UNDER THIS AGREEMENT, AND THAT THE PERSON SIGNING ON BEHALF OF EACH HAS BEEN PROPERLY AUTHORIZED AND EMPOWERED TO ENTER INTO THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT, UNDERSTANDS IT, AND AGREES TO BE BOUND BY IT.**

| | |
|---|---|
| By execution, signer certifies that signer is authorized to accept and execute this Agreement on behalf of DSI. | By execution, signer certifies that signer is authorized to accept and execute this Agreement on behalf of Customer. |
| Signed by DSI and effective as of __August 31, 2018__ ("Effective Date") | Date signed __August 31, 2018__ |
| **DATA SYSTEMS INTERNATIONAL, INC.** | **DEPLOYED RESOURCES LLC** |
| By: _(DocuSigned by: 471A3B650F6D4B9...)_ | By: _(DocuSigned by: Mel P Booker III, 591E66EFC00549D...)_ |
| Print Name: Mark L. Baldwin | Print Name: Mel P Booker III |
| Title: CFO & General Counsel | Title: CFO |